Filed 9/2/21  In re R.C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re R.C., a Person Coming Under the Juvenile Court Law. | B308229 (Los Angeles County  Super. Ct. Nos.  20CCJP00914,  20CCJP00914A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>A.S.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Lori N. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro Silva, County Counsel, Kim Nemoy, Assistant County Counsel, William D. Thetford, Senior Deputy County Counsel, for Plaintiff and Respondent.

---

The juvenile court sustained a Welfare and Institutions Code section 342[1] petition alleging that 12-year-old R.C. was at substantial risk of serious physical harm due to mother April S.'s failure to make an appropriate plan for his safety and well-being and unwillingness and inability to provide him with ongoing care and supervision. The court subsequently declared R.C. a dependent of the court and removed him from mother's care.

Mother contends the evidence was insufficient to support the court's jurisdictional findings, because R.C. was not at risk of harm as a result of her conduct. She further contends the court relied on the wrong statutory provision to remove R.C. from her custody. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.     Family Background

R.C., the only child of mother and father J.C., was born in 2007. Days after R.C.'s birth, the juvenile court sustained a section 300 petition alleging that he was at substantial risk of physical harm due to mother's and father's substance abuse and domestic violence. R.C. was placed with his maternal grandmother in 2008. He lived there until early 2009, when the court issued a home-of-parent order placing him with mother. The dependency case was closed in late 2009, with an exit order

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

awarding mother full legal and physical custody of R.C. A "Conciliation Court Agreement and Stipulated Order Re Custody and Parenting Plan" filed April 18, 2012 provided that R.C. "shall be in Mother's care during all time not designated below as Father's time," and father's time was "up to 48 hours every week with the Paternal Grandmother present." The court took judicial notice of "all court orders" and "contents of judicial file."

At some point, mother left R.C. in the care of either or both father and paternal grandmother and thereafter had virtually no contact with him. According to father, mother left R.C. with him when R.C. was four years old and father "never saw or heard from her again." R.C. similarly told a DCFS dependency investigator (DI) that he had not had contact with mother "since age 5." On another occasion, however, R.C. told a Los Angeles County Department of Children and Family Services (DCFS) children's social worker (CSW) that he had not spoken to mother "in about 4-5 years," which would mean he was about seven or eight when mother left. Mother also stated that she left R.C. with paternal grandmother when R.C. was seven years old, and saw R.C. for the last time at his eighth birthday party.

## B. Section 300 Petition Filed

R.C. came to the attention of DCFS again on February 11, 2020, when the Los Angeles County Sheriff's Department served a search warrant at father's residence. In addition to two loaded guns, steroids, "numerous" Xanax pills, 50 grams of fentanyl, and a pound of methamphetamines, the deputies found R.C. sleeping in a bedroom. A CSW spoke privately with R.C., who was well-dressed, appropriately groomed, and showed no signs of abuse or neglect. R.C. told the CSW that he and father lived with father's friend, Jonathan. They moved there from Las Vegas about two or

3

three months ago, but father had not yet enrolled R.C. in school despite R.C.'s weekly requests that he do so. R.C. stated that he stayed at home watching television and playing video games. R.C. believed that father, who did not otherwise work, was selling drugs. R.C. told the CSW, "he has guns in the home and I think those bags in his room are drugs and I know because I play a lot of Grand Theft Auto and I do the same thing on games." R.C. also told the CSW that he had recently handled a loaded gun that father kept under the kitchen sink.

The CSW spoke to father at the jail later in the day. Father told the CSW that the guns and drugs found in the apartment belonged to his roommate, Jonathan. When the CSW asked about items that had been found in father's bedroom, father "put his head down and would not answer the questions." He also told the CSW, however, that "he had guns for protection and has them out in the open so that his child can use them in case of an emergency." The CSW noted that father appeared to be under the influence, based on "redness in his eyes, bad body odor that resembled marijuana and was mumbling his words."

The CSW asked R.C. and father about mother's whereabouts and contact information. They both told him that they had not seen or heard from mother in years and did not have contact information for her.

DCFS detained R.C. in shelter care and filed a dependency petition under section 300, subdivision (b). The sole count, b-1, alleged that father "established an endangering and detrimental home environment" by possessing guns and illicit drugs that were accessible to R.C., and that this "endangers the child's physical health and safety, placing the child at risk of suffering serious

4

physical harm, damage and danger." The court found a prima facie case for detention on February 14, 2020.

## C. Mother's First Interview

Following the detention hearing, DCFS attempted to locate mother and notify her of the proceedings. On March 31, 2020, the DCFS worker who prepared DCFS's due diligence report notified the DI that mother left him a voicemail on March 26, 2020. The DI called and "left a detailed message" for mother. DCFS later texted mother at the same number. DCFS filed a last-minute information on June 26, 2020 stating that it had not yet heard back from mother.

According to a last-minute information filed on July 29, 2020, mother left a voice mail message for a DCFS CSW on July 20, 2020. In the message, she stated that she had heard about the pending case and had been trying to contact DCFS to find out where R.C. was. The DI called mother back on July 23, 2020 and "left a detailed message asking mother to return DI's call." Mother called back the same day but "started screaming and yelling" as soon as the DI answered the phone; the DI terminated the call.

A different DCFS worker managed to speak to mother later on July 23, 2020; mother "presented as upset, [but] with time, she was able to calm down and provide relevant information." During that conversation, mother reported that R.C. was born while she was "in detention," and that "both parents had tendencies to criminality and explosive personalities." Mother left R.C. with paternal grandmother "due to her [mother's] history of instability, father being aggressive towards her and a need to stabilize her life in order to assess if she could be a good mother to the child." At that time, mother "did not have

5

immediate concerns that the child would have contact with his father as the father was only aggressive towards her but he clearly loved the child." Mother recently learned that paternal grandmother had passed away,[2] but had not contacted father or R.C. Instead, she reported that she "regularly checks on the inmate locator system as she would expect for the father to have law enforcement involvement." Mother stated that she had not had recent law enforcement involvement; she had a job, was attending a cosmetology program, and was enrolled in counseling. Mother also reported that she was married and had stepchildren. Mother told DCFS that she was "not requesting visitations [*sic*] or contact with [R.C.]"; she "acknowledged that she has not been a mother figure in [R.C.]'s life and does not expect to resurface in his life unless this is what he wants for himself or would be to his benefit." Mother stated that she "does not want to push a relationship on the child, wants him to be stable, believes he should receive therapy."

**D. Section 300 Petition Adjudication**

DCFS filed a jurisdiction/disposition report on July 30, 2020. It included a summary of a March 19, 2020 video interview with R.C., who stated that he had lived with father "all his life" but had not had contact with mother "since age 5." R.C. was not bothered by the lack of contact with mother. He stated that he did not want to live with mother or maternal relatives, because

---

[2] R.C. also told a DI that his paternal grandmother was deceased; he reported that when she was alive, she "took care of me, she cooked, took me places, she took me to school and take [*sic*] me out. My dad helped out. . . ." R.C.'s paternal uncle told DCFS that paternal grandmother's funeral was held in approximately September 2019.

6

he did not believe they would let him see father, but said he was willing to talk to maternal grandparents. With respect to the allegations in the petition, R.C. denied that father used drugs or alcohol. He further stated that the guns in the family's home belonged to Jonathan. R.C. also told the DI that father "was busy and would fall asleep all the time," including once while driving with R.C. in the car.

When the DI and CSW spoke to father about the allegations, his "speech was not clear and he was muttering," he was agitated, and he "appeared to be dozing off." He denied having a history of drug or alcohol use or possessing weapons. As of the writing of the report in late March 2020, father refused to drug test, was not enrolled in services, and had visited with R.C. only once.

DCFS recommended that the petition be sustained and R.C. removed from the custody of father and mother. It recommended family reunification services for both parents.

The court adjudicated the section 300 petition on July 30, 2020. Mother was not present. The court acknowledged that she recently had been located, however, and stated that it would "put over disposition to allow counsel an opportunity as a friend of the court to reach out to the mother." The court sustained an amended version of the petition, finding that father "established an endangering and detrimental home environment for the child in that on 02/11/2020 the father possessed 50 grams of fentanyl, a pound of methamphetamine and 2 loaded handguns in the child's home within access of the child. On prior occasions the father possessed and sold illicit drugs from the child's home. On prior occasions the father drove in a vehicle in which the child was a passenger in the vehicle and the father possessed illicit drugs in

7

the vehicle within access of the child. Such an endangering and detrimental situation established for the child by the father endangers the child's physical health and safety, placing the child at risk of suffering serious physical harm, damage and danger." The court ordered DCFS to "fully interview mother for the disposition along with the father and [R.C.] now that she's been located."

## E. Mother's Second Interview

On August 18, 2020, DCFS filed a last-minute information notifying the court that it had contacted mother on July 24, August 8, and August 18 to notify her of the upcoming disposition hearing. DCFS requested that mother contact the DI, but "[a]s of the writing of this report" she had not yet done so. The court held a progress report hearing on August 19, 2020, at which it received a report from DCFS and appointed counsel for mother. Mother's counsel informed the court that "counsel's efforts to contact mother have been unsuccessful." The court ordered counsel to continue trying to contact mother, and ordered DCFS to provide mother with counsel's contact information.

On August 27, 2020, DCFS filed an amended section 300 petition. Count b-1 was the original allegation that had been sustained as amended on July 30, 2020. New count b-2 alleged that R.C. "is a victim of General Neglect by mother, . . . as she has been in and out of her child's life in the last 4 years. Mother has not provided any care for child [R.C.] in the last 4 years. Reportedly, mother left the child [R.C.] in the care of father and paternal grandmother (Genie); however, when paternal grandmother passed away, mother knew of father using Methamphetamine and engaging in criminal activities and she failed to take actions to ensure [R.C.]'s safety. The child's mother

8

has failed to provide the child with the basic necessities of life including, but not limited to, food, clothing, shelter and medical care. Further, the child [R.C.]'s mother, . . . has a history of substance abuse and is a current abuser of methamphetamine, which renders the mother incapable of providing the child with regular care and supervision. Said inability to provide appropriate parental care and supervision of the child by mother endangers the child's physical health and safety and places the child at risk of serious physical harm and damage."

DCFS filed a last-minute information August 28, 2020. It reported that mother called the DI on August 27, after the DI sent several text messages and left a detailed voicemail. During the ensuing conversation, the DI informed mother that it was important for her to contact the court. Mother "became upset" and said she had been trying for six months, and "'even judge is upset that no one has tried to reach me.'" She also blamed DCFS for not reaching out to her.

The DI reviewed the court orders and current case status with mother. In response to the DI's questions about mother's future plans and her ability to care for R.C., mother "sounded defensive and stated, 'I want to be available. I had custody of my son, why do I need to go to reunification. We (referring to herself and father) had no problem with my son to go to Genie (referring to paternal grandmother who is deceased) when she was alive.'" When the DI attempted to review the previous dependency case with mother, she again "became defensive." Mother stated, "'That's not true, you have to get your facts straight, you don't know, I have full custody of my child.'" The DI stated that she understood mother had reunified with R.C. but had subsequently "made arrangements for child to live with paternal

9

grandmother." The DI asked why mother had done that, and she responded, "'I had a place available. I am not living in a criminal way, I am made sure [*sic*] my life is good, in case everyone failed [R.C.]." The DI then asked again what mother's plans were with respect to R.C. Mother "became irritable" and stated, "'I don't know, I have full custody of him. I am taking care of my father who has cancer, my grandfather [*sic*] knows [R.C.], I don't want to lay that on [R.C.]."

Mother told the DI she had last seen R.C. at his eighth birthday party, at which she "'gave him gifts and told him I loved him.'" She continued, "'I left him with his father, his father was angry and I had to decide what's best for [R.C.], it breaks my heart not to be without [*sic*] him.'" Mother explained that she did not reach out to R.C. after that, "'because I don't want to impose my will.'" When the DI asked for clarification, mother stated, "'It is different [*sic*] for me to navigate, his father is a good person and loves [R.C.].'" When the DI asked the same question later in the conversation, mother added, "'I was stable, but only as a support.'"

Mother suggested that her stability had increased, telling the DI, "'I am not using drugs for 13 years, I am married to a Los Angeles Public Defender.'" When the DI asked, again, what mother's plans for R.C. were, she responded, "'I am willing to step in regardless of what happens. [R.C.]'s father is in prison and he will be part of his life. Genie (referring to paternal grandmother) was a good woman, she helped me a lot. His father (referring to [R.C.]'s father) physically abused me, my son does not need to know it, [it] is none of his business. I go visit him in jail. I was 14 when I met him, he was 25. He is violent, jealous, there was no co-parenting, it was hard. Just because we could not see eye to

10

eye, did not mean he was a bad father.  When he was in jail I made sure [R.C.] visited his dad in jail.  I took care of [R.C.] until he was 7 years old and then I just could not do it.  I was a baby; I was only 20 years old.  I left [R.C.] to Genie (referring to PGM).'"

Mother said that she did not have concerns about R.C.'s safety when he was in father's care:  "'[h]e might have beaten me, the way he loved his son is not the way he loved me.'"  The DI informed mother that DCFS had concerns that mother left R.C. in father's care despite being aware of his drug use and criminal behaviors.  Mother initially "became upset" and said, "'I was absolutely not aware, I was never using drugs when the police came (she was referring to the prior dependency case).'"  She then stated, however, that father "'gets high on Meth and he goes and he steals it and it is a pattern for him. Genie was the only one who could handle him, I could not navigate him."  When asked if she wanted a relationship with R.C., mother stated, "'I am prepared, I am raising my step kids, I don't know what he (referring to [R.C.]) wants.'"  When the DI told mother about the upcoming hearing, mother added, "'That's a short notice, I can get an apartment, I want what's best for him.'"

The DI reported that she "found it difficult to engage mother in reciprocal conversation" during the interaction.  "If mother did not like what she heard, she would become defensive immediately."  The DI added that mother's "answers and thoughts appeared to be scattered," and "[s]ome of her answers did not make sense."  According to the DI, "[i]t appears that mother wants to maintain some contact with child [R.C.]; however, she does not want to be fully responsible for him.  When DI discussed Department's concerns, mother was not taking responsibility and blamed Department for not locating her in a

11

timely manner.  Although mother reported to be stable; [*sic*] however, she did not appear to have a plan to reunify with child. Mother stated to this DI that she had full custody of [R.C.] and did not need reunification services."  The DI added that mother "appears to lack insight" into the various losses R.C. had suffered in his life, and expressed "concern regarding inconsistencies in some of mother's responses regarding father."  The DI recommended that the court sustain the recently filed amended section 300 petition and order mother to enroll in services including individual counseling and parenting classes.

## F.     Section 342 Petition Filed

On August 31, 2020, DCFS filed a last-minute information requesting a continuance to file a section 342 subsequent petition "due to concerns regarding mother's ability to safely have custody of the child."  At a hearing on September 1, 2020, the court noted that DCFS had filed "an amended 300" petition that "should have been a 342 petition" and granted the request for continuance so the appropriate petition could be filed.  The court also ordered DCFS to "do a full assessment with respect to mother," with the aim of gaining more information about family's prior DCFS history and mother's "position regarding release" of R.C. to her care.  Mother's counsel informed the court mother "would be willing to have [R.C.] released to her care, but she is sensitive to the fact that . . .she has not had contact with him in a while and that release would be dependent on whether or not [R.C.] wants to return to her care."

On September 10, 2020, DCFS filed a section 342 petition containing two allegations under section 300; it essentially divided the allegation of the amended section 300 petition into two.  Count b-1 alleged that mother "failed to make an

12

appropriate plan for the child's safety and well-being. The mother left the child in the care of the paternal grandmother, . . ., who is now deceased, knowing that the father, . . . resided in the home and he had unresolved issues with substance abuse. Such an inappropriate plan made by the mother endangers the child's physical and emotional health and well-being and places the children [*sic*] at risk of physical harm, damage and danger." Count b-2 alleged that mother "is unwilling and unable to provide the child with ongoing care and supervision. The mother is not requesting visitation or contact with the child. The child does not want contact with the mother. Such inability and unwillingness on the part of the mother to provide the child with ongoing care and supervision endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

DCFS filed a "non detained" section 342 report concurrently with the petition. Summaries of DCFS's July 23, 2020 and August 27, 2020 conversations with mother that were previously provided in last-minute informations were duplicated in the report; it does not appear that DCFS had additional contact with mother. The report included summaries of two more recent conversations with R.C., however. On June 5, 2020, R.C. told a CSW that he recalled living with mother, mother's boyfriend, and the boyfriend's two children. He stated that at that time he "slept on a mattress with no sheets." On September 1, 2020, R.C. told a CSW that he was "not ready to begin contact with his mother." He stated, "'I despise that idea. I don't want to go live with her, I only have bad memories of when I was with her.'" DCFS asserted that it had identified two "safety and risk factors" that would place R.C. "at immediate risk of harm if

13

released to the care of his mother:"  (1) "[t]he mother has not maintained regular visitation with the child and has not established a bond with the child"; and (2) "[t]he mother left the child under a verbal care agreement, knowing that the father would have full access to the child.  The mother failed to make an appropriate care arrangement.  Mother was well aware of father's unstable home environment which involved substance use, emotional instability and law enforcement involvement."  DCFS recommended that the court detain R.C. from mother.

The court held a detention hearing on the section 342 petition on September 15, 2020.  Mother attended the hearing telephonically.  Mother's counsel submitted on the detention and requested visitation.  The court found a prima facie case for detention.  It ordered DCFS to "follow up" with visitation schedules for mother and father, who remained incarcerated.  The court set October 6, 2020  for a combined disposition hearing on the section 300 petition and an adjudication and disposition hearing on the section 342 petition.

## G.    Section 342 Petition Adjudication and Disposition

DCFS filed a jurisdiction/disposition report regarding the section 342 petition on September 28, 2020.  DCFS reported that it had been unable to make additional contact with R.C. or mother and again reproduced the information from its previous interviews with them.  DCFS was able to speak with R.C.'s caregiver, who reported that R.C. was "doing okay" and "does not talk much about his mother" aside from mentioning that "he does not want to go back to his mother and the relatives on his mother's side."  DCFS reported that, as of the writing of the report, mother had not contacted DCFS to request visitation with

14

R.C.  DCFS recommended that the court sustain both allegations and remove R.C. from mother's and father's custody.

At the October 6, 2020 hearing, the court admitted into evidence the section 342 petition and 10 reports and last-minute informations prepared by DCFS.  At DCFS's request, it also took judicial notice of "all sustained petition [*sic*], all court ordered case plans, all court orders and findings, and contents of judicial file for this case."  No other parties introduced any evidence or testimony.

The court addressed the section 342 petition first. R.C.'s counsel argued that the petition should be sustained.  With respect to count b-1, she pointed to mother's failure to "make plans" for R.C. after paternal grandmother's death, even though mother believed paternal grandmother was the only one who could "handle" father.  With respect to count b-2, R.C.'s counsel cited mother's stated inability to care for R.C. after he was seven years old and her failure to contact R.C. for four years.  Counsel for DCFS joined these arguments "in full."  With respect to count b-1, he added that "mother has been M.I.A. from the minor's life and she has not had regular contact with him since the age of six," was not requesting visitation, and "gave no affirmative indication that she wants to reunify."  He further asserted that there "is no bond between" mother and R.C., and "she seems preoccupied with raising her stepchildren."  With respect to count b-2, DCFS counsel argued that mother "was well aware" or, "[a]t a minimum, . . . should have known," of father's substance abuse, criminal activity, and unstable home environment when she "left the child under a verbal care arrangement knowing that the father would have full access of [*sic*] the child."  He also contended that mother's purported unawareness of paternal

15

grandmother's death was "not really an excuse because she should have known about her son's caregiver dying and she should have immediately and promptly followed up to make appropriate arrangements." Father's counsel also argued that the petition should be sustained.

Mother's counsel asked the court to dismiss the section 342 petition. With respect to count b-1, she asserted that mother "picked the most responsible person she could find to take care of" R.C. when she left him with paternal grandmother, and acted with R.C.'s best interests at heart. Counsel emphasized that "until the paternal grandmother passed away in 2019, there had been no referrals, no hints of abuse or neglect. . . ." Counsel further asserted there was "no indication" that mother knew "father was continuing with his criminal history," or that she knew R.C. "had been living with father for months on end after paternal grandmother's passing or that she looked away in any way." She contended that mother acted promptly to "reach out and make appropriate arrangements" for R.C. after she learned of paternal grandmother's death, "but the department did not reach out back [*sic*] to her." With respect to count b-2, counsel asserted that mother's acknowledgment that she had not been a mother figure to R.C. "doesn't mean that she's not willing or unable to provide ongoing supervision." To the contrary, counsel contended, mother "kept herself clean and sober so that in case there's ever a time where the appropriate plan that she made was no longer viable, she would be there as a support for [R.C.]." Counsel conceded that "mother's idea of parenting is not conventional," but noted that "there are grandparents who take care of their grandchildren all across the world." Counsel further argued that mother was "sensitive" to R.C.'s needs and was "not

16

about to force herself on" him, "but she's not about to walk away from him either."

The juvenile court "adopt[ed] by reference the facts noted on the record by" R.C.'s counsel and sustained the section 342 petition in its entirety. The court explained: "The mother's position in this case seems to present several conflicts. On the one hand, there is the indication that she did not know about the father having access to [R.C.] while he was with the paternal grandmother, that there were no prior referrals as to the paternal grandmother, that there was no indication that she knew that father was continuing with the criminal activity while [R.C.] was with the grandmother. She had no indication of the paternal grandmother passing. [¶] So on the one hand, there is an argument that she was not aware of all this information. At the most basic level that cuts against having an appropriate plan and being able to at least follow up with caregiver to make sure your child is doing well. [¶] However, the record does not support the contention that she was not aware of all the concerns that are raised with respect to the 342. Some of these were raised by [R.C.'s counsel] and indicated on the record by [her]. . . . [¶] Mother specifically indicates that she did not have immediate concerns that the child would have contact with his father as the father was only aggressive towards her, but he clearly loved the child. So, clearly, it's not supported by the record that mother did not know that [R.C.] would have contact with the father, but, rather, with a plan with the paternal grandmother she was in a better position to address the concerns that were raised by the father. [¶] Also, with respect to the contention that she did not know that the paternal grandmother died and that thereafter father assumed the full responsibility for [R.C.]. . .had mother

17

been keeping in touch with the paternal grandmother. . . just to make sure that [R.C.] was doing okay, she would have known of paternal grandmother's passing. . . . [¶] . . . Mother provides a vivid description of the father and her awareness of the concerns regarding the father. And these are addressed in the report. . . . And the department does indicate that [R.C.] was left under a verbal care arrangement knowing that [father] would have full access to the child while the mother also knew the concerns that she stated she had about the father which ultimately led to the filing of the petition based on what was sustained by the court. [¶] Based on the totality of the facts in the record, the court's finding that the department met its burden."

The court then heard argument on the disposition of both the section 300 and section 342 petitions. DCFS's counsel recommended that R.C. remain suitably placed, with a case plan that included family reunification services to both parents. R.C.'s counsel submitted on placement but asked the court to add to mother's case plan conjoint counseling with R.C. "when deemed appropriate by [R.C.]'s therapist." Mother's counsel "submitt[ed] on suitable placement and family reunification services," but objected to certain aspects of mother's case plan. Father's counsel was "not opposed to the case plan as proposed."

The court declared R.C. a dependent under both petitions. It continued, "understanding that the burden for disposition is higher, the court finds by clear and convincing evidence that there is a substantial danger if [R.C.] were returned to the parents or placed with the parents. The court's also making these findings under [sections] 245.5, 361(a), 361(c), 361(d), and 362(a). [¶] There are no reasonable means by which to protect him without removing him. [¶] Reasonable efforts were made to

18

prevent or eliminate the need for removal. [¶] Family reunification services for the parents." The court ordered mother to participate in individual counseling to address case issues, conjoint therapy with R.C., and drug testing "upon reasonable suspicion." It ordered monitored visitation for mother, and gave DCFS discretion to liberalize.

Mother timely appealed.

## DISCUSSION

### A. The Appeal is Justiciable

DCFS contends that mother's appeal should be dismissed as nonjusticiable. Because father has not challenged the court's exercise of jurisdiction over R.C. in connection with the section 300 petition, DCFS contends, "the reversal mother seeks would be without practical effect and the appeal should be dismissed." Mother disagrees, arguing that we may reach the merits of her appeal because the jurisdictional findings on the section 342 petition serve as the basis for the court's dispositional order, which she is also challenging. We agree with mother.

It is well settled that juvenile court jurisdiction attaches to children, not their parents. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) "As a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child." (*Ibid.*) "A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established." (*Id.* at p. 1492.) "As a result, it is commonly said that a jurisdictional finding involving one parent is '"good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of

19

the statutory definitions of a dependent."' [Citation.]" (*Ibid.*) Thus, if there is a single valid—or merely unchallenged—basis for exerting dependency jurisdiction over a child, a challenge to other jurisdictional bases will likely have no effect on the juvenile court's order. (See *ibid.*; see also *In re Joshua G.* (2005) 129 Cal.App.4th 189, 202; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) In such cases, we need not address whether sufficient evidence supports other jurisdictional finding, because no relief we could grant would have any practical, tangible impact on the proceedings. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

Nevertheless, "we may exercise our discretion to reach the merits of the other parent's jurisdictional challenge in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) DCFS contends none of these circumstances is present here, because mother "does not raise any independent issue with respect to a disposition order," challenge her case plan, seek custody of R.C., or "show how either jurisdictional finding could be prejudicial in this or any future dependency or family law proceedings." However, mother expressly challenges the court's removal of R.C., a dispositional order tied directly to the court's exercise of jurisdiction in the section 342 petition. We accordingly conclude mother's appeal is justiciable and proceed to the merits.

**B.     The Jurisdictional Findings are Supported by Substantial Evidence**

Mother contends that the court's jurisdictional findings under section 342 were not supported by substantial evidence. We disagree.

### 1.     Legal Principles

Section 342, subdivision (a) provides, "[i]n any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." (§ 342, subd. (a).)  A child is described by section 300, subdivision (b)(1) if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . ." (§ 300, subd. (b)(1) [as alleged here].)  To support jurisdiction under section 300, subdivision (b)(1), there must be (1) conduct by the parent or guardian as described in the statute; (2) causation; and (3) serious physical harm or illness, or a substantial risk thereof, to the child.  (See *In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.)  The parent's conduct need not be blameworthy for jurisdiction to lie.  (*In re R.T.* (2017) 3 Cal.5th 622, 624, 634.)  "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216.)  "The court may consider past events in deciding whether a

21

child presently needs the court's protection. [Citation.] A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue.' [Citation.]" (*Id.* at p. 1216.)

We review the juvenile court's jurisdictional findings under the substantial evidence standard. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In doing so, we determine whether substantial evidence, contradicted or uncontradicted, supports the findings. We examine the record in the light most favorable to the court's determinations, drawing all reasonable inferences in support of the findings. We do not reweigh the evidence or exercise independent judgment; issues of fact and credibility are properly resolved in the juvenile court. We affirm the findings if the record includes substantial evidence from which a reasonable trier of fact could find jurisdiction. (*Ibid.*)

### 2. Analysis

The court sustained count b-1 of the section 342 petition, which alleged that mother failed to make an appropriate plan for R.C.'s safety when she left him with paternal grandmother and father with knowledge of father's unresolved substance abuse issues. Mother contends that the evidence does not support this finding because mother "reasonably believed she left her son in the care of the paternal grandmother, who Mother trusted could handle Father," any risk was eliminated after father was incarcerated, and mother "was not a threat" to R.C.[3] We disagree.

_____

[3] DCFS asserts that mother has forfeited her arguments by failing to "challenge the legal sufficiency of the section 342 petition below." However, mother is not challenging the legal

As mother acknowledges, "it can be argued that Mother should have been aware of Father's drug use and criminal activity, which arguably placed [R.C.] at risk of harm." Mother's own statements to DCFS support the conclusion that mother was, in fact, aware of father's issues. She stated that father had an "explosive" personality, she regularly checked the state inmate locator system because she "expect[ed] . . . father to have law enforcement involvement," and she knew that father "gets high on Meth and he goes and he steals it and it is a pattern for him." She nevertheless left R.C. in a situation in which father would have unfettered access to him. Even if mother believed paternal grandmother could "handle" father when mother initially left R.C. with her, mother entirely failed "to at least follow up" with paternal grandmother to ensure that remained the case over the next several years. Indeed, mother was unaware that paternal grandmother had died, and, after learning of her passing, made no effort to contact R.C. or father despite her knowledge of father's substance abuse and criminal issues and her inability to "navigate" them. The court reasonably concluded this was not an appropriate plan for R.C.'s care.

Mother asserts that neither she nor father was "a threat to" R.C. at the time of the jurisdictional hearing, because father was incarcerated and she had stabilized her life in recent years and therefore was "fully capable, prepared and able to make appropriate parenting choices for [R.C.]." Father's conduct is not directly at issue here. Even if it were, there is no evidence in the

---

sufficiency of the petition, but rather the sufficiency of the evidence supporting the court's jurisdictional findings. The forfeiture argument accordingly is misplaced; we reach the merits of mother's claims.

record that mother made any effort to ensure that R.C. was cared for after father was incarcerated. To the contrary, the record reflects that mother failed to respond to DCFS's messages and notices for months at a time. Even after speaking with DCFS, mother made no efforts to make appropriate parenting choices for R.C. despite her acknowledgement that she still had legal custody over him. Instead, she told DCFS that she "has not been a mother figure" in R.C.'s life, did not "expect to resurface in his life," and did not "want to push a relationship on" him. Mother may have been caring for herself and her stepchildren, but she made it clear that she was not interested in caring for R.C. on a day-to-day basis. Her continued indifference, even if well-intentioned, supports the court's finding that mother failed to appropriately plan for R.C.'s care, and, despite her assertion to the contrary, that she was likely to make the same choice again.

The cases on which mother relies are inapposite. In *In re X.S.* (2010) 190 Cal.App.4th 1154, a father who did not know he was an infant child's biological father made no effort to care for the child until after paternity was established. (*In re X.S.*, *supra*, 190 Cal.App.4th at p. 1160.) Before that time, "the child was well cared for in the home of his maternal grandmother," and after the child was detained, father immediately requested a paternity test, "represented that he would 'step up' if he were determined to be the child's biological father," and in fact assumed responsibility for the child after his paternity was established. (*Id.* at p. 1161.) Here, mother was well aware of her biological relationship to R.C. and made no efforts to ensure he was properly cared for even after learning that his caregiver had died. Mother asserts that her "failure to know when the paternal grandmother died and to know [R.C.] was left in the care of

Father did not cause [R.C.] any harm," but this assertion is belied by the record: while in father's care, R.C. had access to drugs and firearms and was, as the court found in sustaining the section 300 petition, at substantial risk of harm.

Mother also points to *In re Janet T.* (2001) 93 Cal.App.4th 377, 388-389. There, the court found that a mother's mental health issues and consequent failure to ensure that her children attended school regularly did not place them at risk of serious physical harm. However, father's failure to enroll R.C. in school was not at issue in the section 342 petition or cited as a basis to support jurisdiction thereunder. Mother's reliance on *In re Alysha S.* (1996) 51 Cal.App.4th 393 is also misplaced. There, the court found that substantial evidence did not support a finding that the child was at risk of serious physical harm where there was no indication that the child witnessed mother and father's domestic violence and mother promptly obtained a restraining order, and there was no evidence that a single incidence of questionable touching was likely to recur. Here, in contrast, mother continued to demonstrate an unwillingness to provide regular care for R.C. This continued unwillingness, even in the face of knowledge that R.C.'s previous caregiver was deceased, also distinguishes the instant case from *In re Antonio F.* (1978) 78 Cal.App.3d 440 and *In re Andrew S.* (2016) 2 Cal.App.5th 536.

Because we conclude that substantial evidence supported the court's jurisdictional findings on count b-1, we need not and do not consider mother's argument that the court's jurisdictional findings on count b-2 were not supported by the record. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of

25

jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence."  (*In re Alexis E., supra*, 171 Cal.App.4th at p. 451.)

**C.    The Disposition Order was Proper**

Mother contends the court erred by ordering R.C. removed from her custody "without first considering whether [R.C.] resided with both parents at the time the petition was initiated."  She argues that the court improperly relied upon section 361, subdivision (c), "which applies only to a custodial parent," and further asserts the court erred in considering removal in any event because she did not seek custody of R.C.  We are not persuaded.

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent."  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  The juvenile court may consider both present circumstances as well as the parent's past conduct in determining whether removal is appropriate.  (See *id.* at p. 170.)  "Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child."  (*Ibid.*)  While the court has broad discretion to determine what is in the child's best interests and to fashion a dispositional order, there must be "clear and convincing evidence that removal is the only way to protect the child."  (*Id.* at pp. 170-171; see also *Conservatorship of*

26

*O.B.* (2020) 9 Cal.5th 989, 995-996 [clear and convincing evidence standard applies on appeal].)

Mother does not dispute in her opening brief that substantial evidence supported the removal.[4]  Rather, she asserts the court relied on the wrong statutory provision, section 361, subdivision (c).  That statute provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds by clear and convincing evidence . . . [that t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's. . . physical custody."  (§ 361, subd. (c)(1).)

---

[4] Mother does assert, in a single sentence in her reply brief, that "a detriment finding cannot be based solely on a parent's absence from a child's life or on a child's wishes not to reside with the parent."  To the extent we consider this assertion, belatedly raised for the first time in the reply brief, we are not persuaded.  The cases on which mother relies "stand[ ] for the principle that where a child has a fit parent who is willing to assume custody, there is no need for state involvement unless placement with that parent would create a substantial risk of detriment to the child. (§ 361.2, subd. (a).)  When the parent is competent, the standard of detriment is very high.  [Citation.]" (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262, citing *In re John M.* (2006) 141 Cal.App.4th 1564.)  R.C. did not have a fit parent willing to assume custody, and the court's finding by clear and convincing evidence that R.C. would face substantial danger if returned to mother's care was supported by more than mother's absence or R.C.'s wishes.

Mother asserts that section 361, subdivision (c)(1) applies only to custodial parents, and R.C. "had not resided in her custody for more than four years, and was not residing with Mother at the time the dependency petition was initiated following Father's arrest."

The court indeed cited section 361, subdivision (c)(1) when making removal findings during the disposition hearing. However, mother ignores that the disposition hearing and findings applied to both the section 300 petition involving father—with whom R.C. lived when the petition was initiated—as well as the section 342 petition involving her. Nothing in the record suggests the court was referring to mother when it invoked section 361, subdivision (c).

Mother also ignores the court's explicit invocation of section 361, subdivision (d), a virtually identically worded provision which governs removal when a child does not reside with the parent at issue, in this case mother. Section 361, subdivision (d) provides that a child may be removed from the physical custody of a parent "with whom the child did not reside at the time the petition was initiated" if the juvenile court finds by clear and convincing evidence that there would be a substantial danger to the child's physical health or safety and there are no reasonable means by which to protect the child absent removal. (§ 361, subd. (d).) The court thus properly cited section 361, subdivision (d) as authority to remove R.C. from mother.

Mother also argues that the court erred in removing R.C. from her custody because she did not request custody of him. She asserts, "[i]t was improper for the court to order [R.C.] removed from Mother's physical custody unless Mother was found to have been a custodial parent. If Mother was a noncustodial parent, it

28

was error for the court to make a detriment finding because Mother did not request [R.C.] to be placed in her custody. It is the noncustodial parent's request for custody that triggers application of section 361.2, subdivision (a); where the noncustodial parent makes no such request, the statute is not applicable." There is no citation in the record to section 361.2, subdivision (a), however. Instead, the court found, using the express language of section 361, subdivision (d), that "there is a substantial danger if [R.C.] were returned to the parents or placed with the parents." (Compare § 361, subd. (d) [placement with the parent would create "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child"] with § 361.2, subd. (a) [placement with parent would be "detrimental to the safety, protection, or physical or emotional well-being of the child"].)

Even if the court did apply section 361.2, subdivision (a), mother has not demonstrated that the error was prejudicial. (See *In re D'Anthony D.* (2016) 230 Cal.App.4th 292, 303.) "[W]e can neither ignore the similarity between these statutes' mandatory findings, nor disregard the evidence supporting the court's 'substantial danger' finding concerning placement with [mother]." (*Ibid.* [discussing similarity between section 361, subdivision (c) and section 361.2, subdivision (a)].) As noted above, mother does not dispute the evidentiary support for the court's finding under section 361, subdivision (d) in her opening brief. Instead, she asserts, for the first time in her reply, that an erroneous detriment finding "could have foreseeable prejudicial consequences for Mother in future dependency proceedings involving her step-children (who are currently in Mother's custody), as well as for [R.C.] in subsequent proceedings should

29

this case proceed to a section 366.26 hearing to terminate parental rights." This argument accordingly is forfeited. In addition, this assertion does not establish a reasonable probability that the result would have been more favorable to mother absent the alleged erroneous reliance on section 361.2, subdivision (a). (See *In re D'Anthony D.*, *supra*, 230 Cal.App.4th at p. 303.)

## DISPOSITION

The jurisdictional and dispositional orders of the juvenile court are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.